1 Christopher D. Moon (State Bar No. 246622)
*chris@moonlawapc.com*
2 Kevin O. Moon (State Bar No. 246792)
*kevin@moonlawapc.com*
3 **MOON LAW APC**
4 600 West Broadway, Suite 700
San Diego, California 92101
5 Telephone: (619) 915-9432
6 Facsimile: (650) 542-8432
7
*Attorneys for Plaintiff*
8
9 **UNITED STATES DISTRICT COURT**
10 **CENTRAL DISTRICT OF CALIFORNIA**
11
12 MELINDA MARTINEZ,                    ) Case No.:
Individually, on behalf of herself and )
13 others similarly situated,           ) **CLASS ACTION COMPLAINT**
                                       )
14             Plaintiff,              )
                                       )
15      v.                            )
                                       )
16 FCA US, LLC,                        ) **JURY TRIAL DEMANDED**
                                       )
17             Defendant.             )
                                       )
18                                     )
                                       )
19                                     )
                                       )
20 _____ )
21      Plaintiff Melinda Martinez brings this action against Defendant FCA US
22 LLC, ("Defendant" "Jeep" or "FCA"), by and through her attorneys, individually
23 and on behalf of all others similarly situated, and alleges as follows:
24                          **INTRODUCTION**
25      1.    This is a class action lawsuit brought by Plaintiff on behalf of herself
26 and classes of current and former owners of model year 2018-2020 Jeep Wrangler
27 and 2020 Jeep Gladiator vehicles (hereinafter referred to collectively as the "Jeep

Vehicles" or "Class Vehicles"). FCA designed, manufactured, marketed and warranted the Jeep Vehicles.[1]

2.    The Jeep Vehicles contain a defectively designed and/or manufactured solid front axle and damping system that causes the steering wheel to shake violently after encountering common and expected road variations while operating at highway speeds. This phenomenon is referred to as the Jeep "Death Wobble," a term commonly used among Jeep owners to identify this condition, which is known to FCA.

3.    The "Death Wobble" is the seemingly uncontrollable side-to-side shaking of a Jeep's front-end steering components and – by extension – its steering wheel, presenting a serious safety hazard to the driver of the Jeep Vehicle and surrounding drivers. The "Death Wobble" makes the Jeep unsafe to operate by impairing the operator's ability to steer and control the Jeep Vehicle while presenting a safety risk to the occupants and others on the road.[2]

4.    FCA has known the "Death Wobble" has plagued its Jeep Wrangler line of vehicles for over a decade. Unable to remedy the "Death Wobble," FCA consistently puts forth temporary remedies to conceal the "Death Wobble" until the warranty coverage expires. FCA does so knowing these temporary remedies have never rectified the "Death Wobble" in prior Jeep Wrangler models. Beginning with the 2018 Jeep Wrangler model year, FCA redesigned portions of the steering system, but the "Death Wobble" remained.

5.    After receiving thousands of steering-related complaints concerning the Jeep Vehicles by 2019, FCA circulated Customer Satisfaction Notification ("CSN") V41 to its captive dealer network in or before June 2019, which

---

[1] Plaintiff reserves the right to amend or add to the vehicle models included in the definition of Class Vehicles after conducting discovery.

[2] https://www.quadratec.com/c/blog/jeep-death-wobble-how-to-fix

acknowledged the existence of the defect causing the "Death Wobble," and identified approximately 192,000 Class Vehicles, stating:

> The front suspension steering damper on about 192,000 of the above [2018-2019 Jeep Wrangler] vehicles may not effectively damp oscillation of the steering system, resulting in a sustained shake or shimmy in the steering wheel. This can be more noticeable when driving at speeds exceeding 55 Miles Per Hour (MPH) 88 Kilometers Per hour (KPH) after contacting a bumpy road surface and in temperatures below 40° Fahrenheit (5° Celsius).[3]

6.      Pursuant to CSN V41, Defendant requires each vehicle receive the following repair: "Replace the front suspension steering damper on all the above involved vehicles." Figure 1 – Steering Damper from CSN V41 is depicted below:



**Figure 1 – Steering Damper**

7.      Although an estimated population of 270,000 2018-2019 Jeep Wrangler vehicles exist, Defendant identified approximately 192,000 owners who suffer from the defect known to manifest as the "Death Wobble."  According to

---

[3] *See* Customer Satisfaction Notification ("CSN") V41 Steering Damper – Dealer Service Instructions – Rev. 2, June 2019.

CSN V41, FCA would begin notifying owners of Jeep Vehicles in Summer 2019 that this Customer Satisfaction Notice required the repair set forth in CSN V41.

8.     But just as FCA's efforts to remediate the "Death Wobble" failed over the past decade, the repair required under CSN V41 does not remediate the defect or alleviate the "Death Wobble."

9.     Plaintiff's Jeep Vehicle received the repair set forth in CSN V41, but still—and repeatedly—experiences the "Death Wobble," which the repair was falsely represented to remediate.

10.     At all material times, FCA had knowledge of the defective condition existing in the Jeep Vehicles that manifest as the "Death Wobble."  Rather than address this defective condition—or disclose its possibility and/or warn drivers at the point of sale—FCA claims the "Death Wobble" is ***not*** a "safety issue" and that it "can happen with any vehicle that has a solid front axle (rather than an independent front suspension), such as the Wrangler."[4] This strategically allows Defendant to continue its failed repair efforts until the warranty expires and the problem rests exclusively with the owner.

11.     The "Death Wobble" problem has now become so pervasive that Defendant is routinely buying back Jeep Vehicles when presented with claims asserted pursuant to various states' Lemon Laws.  Upon information and belief, Defendant has embarked upon and adopted a secret recall and warranty program of Jeep Vehicles subject to CSN V41 that is concealed from governing authorities and the Classes.

12.     As a direct result of Defendant's wrongful conduct, Plaintiff and the Classes have been harmed and are entitled to actual damages, including damages for the benefit of the bargain they struck when purchasing their vehicles, the

---

[4]https://www.freep.com/story/money/cars/chrysler/2018/11/19/jeep-wrangler-death-wobble-nhtsa/2028633002/

diminished value of their vehicles, statutory damages, attorneys' fees, costs, restitution, and injunctive and declaratory relief.

13. Specifically, Plaintiff seeks: buyback of the Class Vehicles; compensation for the loss in value and depreciation of the Class Vehicles due to the "Death Wobble"; reimbursement for parts and labor costs incurred by Class members who paid third parties to remedy the "Death Wobble" problem, as well as replacement of any components materially damaged by the "Death Wobble"; provision of a temporary replacement vehicle while repair is pending; punitive damages for FCA's knowing fraud that put drivers and members of the public nationwide at risk; and an order requiring FCA to issue a formal recall and repair of the Class Vehicles, including a notice campaign informing Class Members about the recall.

## JURISDICTION AND VENUE

14. This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1332 of the Class Action Fairness Act of 2005 because: (i) there are 100 or more Class members, (ii) there is an aggregate amount in controversy exceeding $5,000,000, exclusive of interest and costs, and (iii) there is minimal diversity because Plaintiff and Defendant are citizens of different States. This court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367 and jurisdiction over the Magnuson Moss Warranty Act claim by virtue of diversity jurisdiction being exercised under the Class Action Fairness Act ("CAFA").

15. Venue properly lies in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District, and because Defendant conducts a substantial amount of business in this District.[5] Accordingly, Defendant has sufficient

---

[5] *See also* Declaration of Melinda Martinez Regarding Venue Pursuant to Cal. Civ. Code § 1780(d), appended hereto as Exhibit A.

contacts with this District to subject Defendant to personal jurisdiction and venue is proper.

## **THE PARTIES**

**Plaintiff Melinda Martinez**

16.     Plaintiff Melinda Martinez is a citizen and resident of the State of California.

17.     Plaintiff Martinez owns a 2018 Jeep Wrangler for personal use that she purchased new in March 2019 from the Jeep Chrysler Dodge RAM FIAT dealership of Ontario in Ontario, California, for approximately $43,000.

18.     After purchasing her vehicle, Plaintiff experienced the "Death Wobble" multiple times.  On one occasion, Plaintiff was driving with her child on a freeway overpass when her Jeep's steering wheel began to violently shake, consistent with the "Death Wobble." The shaking was so severe that Plaintiff believed she was going to lose control of her vehicle.  Needless to say, Plaintiff was absolutely terrified, fearing for her safety and the safety of her child.

19.     As a result, Plaintiff took her Jeep to the Jeep Chrysler Dodge RAM FIAT dealership of Ontario in late January 2020 to have the "Death Wobble" defect fixed.  When Plaintiff arrived at the Jeep dealership, she described to a dealership employee the "Death Wobble" issue plaguing her vehicle.  In response, the employee laughed and explained that the issue is known as the "death shake" and "it happens."

20.     Thereafter, Plaintiff's Jeep received the purported repair set forth in CSN V41.  However, since having the repair performed, Plaintiff still—and repeatedly—experiences the "Death Wobble," which the repair was falsely represented to remediate.

21.     Had Plaintiff known or otherwise been made aware of the "Death Wobble" defect and FCA's inability to repair or cure it, she would not have purchased her Jeep or otherwise would have paid significantly less for it.

22.     When Plaintiff purchased her Jeep, she reasonably relied on the reasonable expectation that her Jeep Vehicle would be equipped with a steering system that was free from defects and safe to operate and/or that Jeep could, and would, properly repair and eradicate any such defects.

23.     At all times relevant herein, Plaintiff operated her 2018 Jeep Wrangler in a reasonably foreseeable manner and as the vehicle was intended to be used, but can no longer do so given the recurring "Death Wobble."

24.     Plaintiff has suffered an ascertainable loss as a result of Defendant's unfair and deceptive conduct, breach of contractual, common law and statutory duties, and omissions and/or misrepresentations associated with the "Death Wobble" and associated safety risk, including but not limited to, out-of-pocket losses and diminished value of her Class Vehicle.

25.     Neither Defendant nor any of its agents, dealers or other representatives informed Plaintiff of the "Death Wobble" and associated safety risk prior to Plaintiff's purchase of the Class Vehicle.

**Defendant**

26.     Defendant FCA U.S., LLC is a Delaware limited liability company with its principal place of business at 1000 Chrysler Drive, Auburn Hills, Michigan.  The Jeep vehicles at issue here are part of the FCA U.S., LLC family of companies, which is, in turn, part of Fiat Chrysler Automobiles N.V.

27.     At all times relevant to this action, Defendant and/or its agents manufactured, distributed, sold, leased, and warranted the Class Vehicles throughout the United States. Defendant and/or its agents designed, caused, manufactured, the Jeep knowing about the "Death Wobble" problem, without

either disclosing it at the time of sale or attempting to remedy it. Defendant and/or its agents also developed and disseminated the owner's manuals, warranty booklets, advertisements, and other promotional materials relating to the Jeep.

## FACTUAL ALLEGATIONS

### A. The Death Wobble Defect

28.　FCA designs, engineers, manufactures and sells vehicles under the Chrysler, Jeep, Dodge, Ram, Fiat and Maserati brands in this District and state, and throughout the United States. FCA manufactures, distributes, and sells motor vehicles and parts through its network of authorized dealers, including Jeep Chrysler Dodge RAM FIAT of Ontario.

29.　Due to the solid front axle, the Jeep Vehicles do not absorb natural vibrations and bumps caused by driving as efficiently as an independent suspension system. Therefore, the solid axle design necessitates a steering damper (or steering stabilizer) to reduce impact of these vibrations and bumps to the operator. The increased vibrations and forces of a solid axle suspension system can cause steering components to prematurely loosen or become damaged, including the front track bar, ball joints, tie rods, control arms, and stabilizers.

30.　As a result of the defect described above, which occurs most often when traveling at speeds over 45 mph, the front suspension system and steering components can become jarred out of equilibrium when the Jeep Vehicles encounter customary and expected variations in the roadway.

31.　The result is a serious safety concern. For the unsuspecting driver, this unexpected violent shaking of the steering column at highway speeds is both alarming and dangerous. To eradicate the problem, the suspension components, including the ball joints, steering damper, track bar and upper inner tie rods need to be inspected and replaced.

32.　In a report dated October 31, 2019, a journalist for CBS News in Boston video recorded the "Death Wobble" experience in James Squires's Jeep

Vehicle, which clearly demonstrates the safety concerns of the "Death Wobble" and the severity of this defect.[6]

**B.    FCA's Longstanding Knowledge of the Defect**

**1.    2012 Reporting on Jeep's "Death Wobble" Problem**

33.    Defendant has received numerous complaints about the Jeep's "Death Wobble" for years and has failed to take action to remedy it or inform its customers of its potential to occur.

34.    In a 2012 news report from ABC7 in San Francisco, two Jeep owners from California reported that "the whole front end of the vehicle shakes back and forth" and that "[i]t literally feels like the front of your vehicle is going to shake apart."[7]

35.    The reporter asked one of the owners featured in the story if she would have bought the Jeep if she had known about the problem, she responded, "No, absolutely not. I drive my son to school and this is my primary form of transportation for my son and I."[8] She explained further, "[t]his is something that I purchased to drive at freeway speeds; ***there was no waiver or disclosure*** at the time associated with it that I should have to be concerned driving it at normal speed . . . ."[9]

36.    In response to the ABC7 news story, FCA "declined a request to go on camera, but Corporate Communications . . . issued a statement saying 'vehicles equipped with a solid axle can be susceptible to this condition.'"  Refusing to accept responsibility, FCA went further and blamed its customers by claiming that

---

[6]  *See*  https://boston.cbslocal.com/2019/10/31/jeep-wobble-federal-investigators-safety-wbz-iteam/

[7]  https://abc7news.com/8224/

[8]  *Id*.

[9]  *Id*. (emphasis added).

"most reported incidents . . . are often linked to poorly installed or maintained after-market equipment."

37.    But, as the reporter pointed out, neither of the Jeeps at issue for the story—*nor the Plaintiff here*— have any after-market equipment.[10]

38.    FCA also told ABC7 that the "Death Wobble" can be corrected with "a change of tires or installation of a simple steering dampener."  Again, though, just as with Plaintiff here, the report indicates that one Jeep owner "replaced the dampener and was hit by the wobble again."[11]

39.    Following this report in 2012, California Congressional Representatives Henry Waxman and Anna Eshoo wrote a letter to FCA in July 2012 urging it to launch a campaign informing its customers that the Jeeps they own could suffer from a safety risk called the "Death Wobble."

40.    Specifically, the lawmakers wrote that they "believe[d] Chrysler should undertake an outreach campaign to its customers, such as a Customer Satisfaction Campaign, to notify Jeep owners of the risk of the 'wobble' condition, also described as a 'vibration' or 'shimmy,' and the possible methods for repairing and preventing the problem," and to "advise customers how to stop the wobble if they experience it while driving."[12]

41.    In response, in August 2012, FCA issued a technical service bulletin to its dealerships acknowledging the issues with Jeep's steering and suspension components and outlining just what dealers should be looking for when someone comes in complaining of front-end shaking, including a detailed inspection of the steering controls and components as well as the tires.  However, FCA would not agree to pay for any such repairs for vehicles outside of the factory warranty

---

[10] *Id.*

[11] *Id.*

[12] https://thehill.com/blogs/floor-action/house/236483-dems-press-chrysler-to-help-its-customers-fix-jeep-death-wobble

period.

42.     In November 2018, as reported in the Detroit Free Press, a Jeep owner from Massachusetts who purchased a 2018 stock Jeep Sport model with some basic comfort and convenience options for approximately $38,000, experienced the "Death Wobble" on I-495 while taking one of his children to a basketball tournament.[13]

43.     In the report, the owner described the incident, "I hit a bump that should have been nothing and all of a sudden I thought I had a flat tire or something else bad because the whole car and steering wheel start[ed] shaking. I slowed down and was getting ready to pull over and then it went away when I slowed down enough (probably around 50 mph)."  "It was concerning, but right that second I just brushed it off," but then, the "[s]ame thing happened once or twice more that weekend on the highway and then once again Monday or Tuesday on the way to work" so he made a service appointment.[14]

44.     The report states that he was told by the dealership that the steering stabilizer was "shot and had no pressure" and that contrary to the claims of FCA otherwise, the dealership told him ***it was a safety issue, and he should not be driving the vehicle***.[15]

45.     In the story, the owner rejected FCA's claims that the "Death Wobble" did not present a safety issue, stating that "[h]aving to rapidly slowdown in the center lane of a highway while going 70 mph definitely is unsafe and the amount of vibration happening from this is just bound to break something eventually . . . ."[16]

---

[13]https://www.freep.com/story/money/cars/chrysler/2018/11/19/jeep-wrangler-death-wobble-nhtsa/2028633002/

[14] *Id*.

[15] *Id*.

[16] *Id*.

## 2. Reports to NHTSA and FCA's Technical Service Bulletins

46. The National Highway Traffic Safety Administration ("NHTSA") has received numerous complaints about Jeep's "Death Wobble" problem. In 2018, it was reported that the NHTSA is looking into the "Death Wobble" reports.[17]

47. Prior to Plaintiff's purchase of her 2018 Jeep, and even before public news reports, FCA had been internally aware of the complaints about the Jeep Vehicles' "Death Wobble." In fact, in an October 28, 2010, Technical Service Bulletin (02-003-10), FCA instructed its dealerships that for Jeep Wranglers built between 2007-2009, when customers complain about "vibration from rough surfaces" they should replace "the steering damper and steering damper bracket."

48. But, just as with Plaintiff, in various online forums discussing the Jeep Vehicle's "Death Wobble" replacing the damper only masks the problem. One Jeep owner wrote on www.wranglerforum.com in April 2011:[18]

> HELP!!!!!! Will a new steering damper permanently eliminate the Death Wobble? My dealer replaced my steering damper per TSB #02-003-10 under warranty after multiple episodes (4) of the dreaded wobble. My 08 wrangler JKU has 27000 miles with all stock equip. My warranty will expire next February and I don't want this to be a repeat issue costing $$$$$$$. I am considering trading it in for something that doesn't scare the crap out of my family when were [sic] doing over 55mph on the highway.

49. To which, another member of the forum posted:[19]

> Nope, only mask it.

50. Currently, the NHTSA online complaint database is replete with complaints, below are only a few examples of those made in 2019:

---

[17] *Id.*

[18] https://www.wranglerforum.com/f202/steering-damper-replacement-death-wobble-89608.html

[19] *Id.*

**NHTSA ID Number**: 11208173
**Incident Date** January 1, 2019
**Consumer Location** Unknown
**Vehicle Identification Number** 1C4HJXDG0JW****
**Summary of Complaint**

*WHILE TRAVELING ON THE FREEWAY AT SPEEDS FROM 65-75 MY JEEP WILL START TO "DEATH WOBBLE" WHEN YOU HIT A BUMP OR UNEVEN SPOT ON THE ROAD REQUIRING ME TO DECELERATE OR COME TO A COMPLETE* STOP. MY VEHICLE HAS BEEN BACK TO THE DEALER 5 TIMES SINCE MY PURCHASE IN NOV OF 2018. FIVE DIFFERENT THINGS HAVE BEEN REPLACED AND *ONE OF THE DAMPENERS HAS BEEN REPLACED TWICE NOW.* IT'S BEEN AT THE DEALER FOR 3 WEEKS STRAIGHT NOW. CHRYSLER SAYS THAT THERE IS NOTHING THAT THEY CAN DO AT THIS TIME AND REFERRED ME BACK TO THE DEALER, THE DEALER SUGGESTED I GET AN ATTORNEY SPECIALIZING IN THE LEMON LAW. I HAVE DONE SO AND ALSO WILL BE TALKING TO THE FEDERAL TRADE COMMISSION. SO FAR I HAVE LOST A DAYS WORK AND FIVE 30 MILE TRIPS TO AND FROM THE DEALERSHIP ONLY TO FIND OUT THAT THE PROBLEM STILL PERSISTS. IT'S VERY DANGEROUS TO DRIVE. THE DEALERSHIP SAID THAT THE NEW ONES WILL SOMETIMES HAVE A LITTLE "WIGGLE" TO THEM AT TIMES AND I INFORMED HIM THAT IF I HAD KNOW THIS *I WOULD NOT HAVE BOUGHT IT HAD I KNOW THIS.* I AM VERY UPSET WITH CHRYSLER AT THE MOMENT. I HAVE NEVER HAD A PROBLEM OUT OF MY 2015 JEEP WRANGLER SAHARA UNLIMITED OR MY 2009 JEEP ALI WRY. I AM VERY DISAPPOINTED IN JEEP.[20]

---

[20]https://www.nhtsa.gov/vehicle/2018/JEEP/WRANGLER/SUV/4WD%252520Later%252520Release#complaint

**NHTSA ID Number:** 11206377
**Incident Date** January 1, 2019
**Consumer Location** RICHMOND, TX
**Vehicle Identification Number** 1C4HJXEG4JW****
**Summary of Complaint**

***VIOLENT STEERING WHEEL SHAKING AND FRONT END STEERING SHAKING WHEN DRIVING OVER ROAD IMPERFECTIONS OVER 60 MPH.*** LOOSE AND WANDERING STEERING RESULTING IN MULTIPLE STEERING CORRECTIONS TO REMAIN STRAIGHT IN LINE ON A FLAT STRAIGHT AND LEVELED SURFACE. WRANGLER WAS IN DEALERSHIP FOR MORE THAN 40 DAYS TOTAL FOR BACKORDERED PARTS AND REPAIRS. WRANGLER PICKED UP TODAY AFTER 3RD VISIT. ***STEERING DAMPER REPLACED FOR 2ND TIME.*** DRIVER SIDE SHOCK ABSORBER REPLACED. VIOLENT SHAKING HAS BEEN RESOLVED SO FAR. BUT LOOSE AND INDIRECT STEERING IS STILL PRESENT. VIDEOS AVAILABLE UPON REQUEST.[21]

**NHTSA ID Number:** 11205859
**Incident Date** May 3, 2019
**Consumer Location** PRESCOTT, AZ
**Vehicle Identification Number** 1C4HJXFG7JW****
**Summary of Complaint**

AFTER INSTALLATION OF THE JEEP MANUFACTURED AND WARRANTIED 2 INCH MOPAR LIFT KIT AT THE JEEP DEALERSHIP, THE ***VEHICLE'S STEERING WHEEL AND FRONT END WILL VIOLENTLY SHAKE AFTER HITTING A BUMP AT SPEEDS OF 50 MILES PER HOUR AND ABOVE.*** THIS WAS MOST COMMONLY SEEN WHEN DRIVING OVER BRIDGES AT SPEEDS OF AROUND 50 MPH. THE VEHICLE WAS TAKEN TO THE DEALER WHEN THEY CLAIMED THEY

---

[21] *Id.*

COULD NOT DUPLICATE THE RESULTS. I THEN HAD TO RISK MY OWN SAFETY TO DEMONSTRATE TO A TECHNICIAN THAT THE PROBLEM WAS INDEED HAPPENING. THIS OSCILLATION OF THE STEERING AND SUSPENSION COMPONENTS IS EXTREMELY DANGEROUS AND REQUIRES ME TO COME TO A COMPLETE STOP BEFORE THE VEHICLE WILL STOP SHAKING. I ALSO HAVE LITTLE TO NO CONTROL OVER THE VEHICLE WHEN THIS HAPPENS UNTIL THE VEHICLE HAS BEEN SLOWED DOWN SUBSTANTIALLY. THE PROBLEM IS ONGOING AND HAS YET TO BE SOLVED.

**NHTSA ID** Number: 11205782
**Incident Date May 4, 2019**
**Consumer Location** CHESTER, NJ
**Vehicle Identification Number** 1C4HJXDG9JW****
**Summary of Complaint**

***WHILE DRIVING AT NORMAL HIGHWAY SPEEDS (60MPH AND ABOVE) EACH OVERPASS, SEAM OR POTHOLE IN THE ROAD CAUSES MY 2018 WRANGLER TO SHAKE AND VIBRATE UNCONTROLLABLY***. AT TIMES THIS "DEATH WOBBLE" IS SO VIOLENT THAT THE ONLY WAY TO MAKE IT STOP IS TO PULL OVER AND COME TO A COMPLETE STOP. IMAGINE TRYING TO KEEP CONTROL OF YOUR JEEP WHILE IT'S SHAKING UNCONTROLLABLY AND YOU HAVE TO CROSS 3 LANES OF TRAFFIC TO PULL OVER. THIS WAS MY EXPERIENCE ON 5.4.19. THIS WAS NOT THE FIRST TIME. ***THIS IS ALSO AFTER THE DEALERSHIP AND MANUFACTURER HAVE "REPAIRED" THE ISSUE ON 3 PREVIOUS OCCASIONS.***

**NHTSA ID** Number: 11205408
**Incident Date May 2, 2019**
**Consumer Location** ESSEX, VT

**Vehicle Identification Nu**mber 1C4HJXEN6JW****
**Summary of Complaint**

WHILE DRIVING ABOUT 65 MILES PER HOUR I
RAN OVER A BRIDGE EXPANSION JOINT ON A
BRIDGE APPROXIMATELY TEN OR MORE TIMES
DURING MY TRIP. ***ON THREE OCCASIONS WHEN
I RAN OVER THE EXPANSION JOINT THE FRONT
OF THE VEHICLE BEGAN TO SHAKE VIOLENTLY
UP THROUGH THE STEERING WHEEL CAUSING
ME TO LEAVE MY LANE OF TRAVEL***. I FEEL IF A
CAR WAS NEXT TO ME AT THE TIME I COULD
HAVE CRASHED. APPLYING BRAKES AND
SLOWING ENDED THE PROBLEM EACH TIME.

51.    On October 24, 2018, a citizen petition was filed with NHTSA requesting that it initiate a safety defect investigation concerning 2018 Jeep Wranglers, which the NHTSA's Office of Defects Investigation ("ODI") opened for evaluation on November 16, 2018.

52.    On March 8, 2019, ODI wrote Defendant seeking information concerning this safety defect investigation, and defined the alleged defect to include: "Concerns related to the steering system such as: . . .Vibration, oscillation or wobbling while driving, including after encountering bumps, potholes or other irregular roadway surfaces."  ODI requested documents detailing steering related complaints received by FCA complaint.

53.    In response ODI's information demand of March 8, 2019, FCA identified 3,566 distinct "Steering related complaints, including steering shimmy/wobble, intermittent lock-up, and looseness/wandering" concerning the 2018-2019 Jeep Wranglers.  While ODI had only received 608 of these complaints, FCA had already received 3,255 additional, separate steering complaints on the Jeep Vehicles by Summer 2019.

54.    While ODI proceeded with its Preliminary Evaluation of these alleged defects, FCA orchestrated the ineffective CSN V41 campaign to remediate—albeit

unsuccessfully—the defects that cause the "Death Wobble." This began with a confidential Dealer Notification Program that occurred soon after FCA received the March 8, 2019 letter from ODI demanding information relating to steering concerns frequently described as the "Death Wobble." This Dealer Notification Program was established by FCA prior to June 2019, and modified several times throughout the year.

55.　FCA intended to notify owners of Jeep Vehicles it identified that the repair work set forth in CSN V41 was required to remedy the defects that manifest as the "Death Wobble." It required notification to all specifically identified Jeep Vehicle owners, which FCA identified as about 192,000 owners out of an estimated population of approximately 270,000 2018-2019 Jeep Wrangler vehicles.

56.　In or about August 2019, Defendant commenced its procedure to mail individual notices to approximately 192,000 owners of 2018-2019 Jeep Vehicles conceding the defect alleged herein, and requiring the repair set forth in CSN V41. The repair is the replacement of steering damper (580AC) with steering damper (580AE), and as Plaintiff alleges, the replacement steering damper (580AE) and repair required by CSN V41 does not remediate the defects that cause the "Death Wobble."

57.　On September 17, 2019, NHTSA decided to grant a citizen petition to initiate a safety defect investigation on the 2018-2019 Jeep Wrangler concerning "Various frame weld quality concerns, such as excessive slag, lack of and/or over penetration, overweld or weld drip, weld splash and porous welds, and steering related issues that may be a result of the aforementioned weld quality concerns."[22] ODI further stated it "needs to further evaluate the alleged steering-related defects reported through MY 2019 and the alleged defects' relation to weld quality."[23]

58.　In conclusion, the ODI stated: "The petition was granted on

---

[22] *See* NHTSA, ODI Investigation: DP 18-004
[23] *Id.*

September 16, 2019.  Preliminary Evaluation PE19-012 has been opened to further assess the scope, frequency, and potential safety-related consequences of alleged weld quality deficiencies and steering related concerns on the MY 2018-2019 'JL' Jeep Wrangler vehicles."[24]

59.    Mark Chernoby, FCA Chief Technical Compliance Officer, was interviewed by the Detroit Free Press and admitted the existence of the "Death Wobble" defect, comparing it to a tuning fork, stating:

> if you bang it with that frequency it'll just sit there and keep going forever. It won't slow down, it won't dissipate, and that's essentially what we're talking about here with the vibration in the new Wrangler. […]  When you hit a bump in the road, if everything is just right, this suspension can set off that resonance and what we started seeing is as soon as it got cold this past fall, early winter, we started seeing complaints.[25]

60.    Mr. Chernoby continued, describing the failure that causes the "Death Wobble" in the steering damper as "air getting into the damper on the front suspension of the Wrangler during cold temperatures, when oil becomes 'thick like molasses' and air bubbles take a long time to get out of the oil."[26]

61.    When asked whether the existing steering dampers (580AC) are defective, Mr. Chernoby stated: "It was a combination of design and manufacturing process."[27]

62.    The new damper is produced by the same supplier as the old damper, who Mr. Chernoby declined to identify.  Instead, Mr. Chernoby quipped over this serious safety concern stating: "***We steer away*** ... from any kind of blame game or even open discussion on suppliers even on safety recalls."[28]

---

[24] *Id.*

[25] https://www.freep.com/story/money/cars/chrysler/2019/08/10/jeep-death-wobble-fix/1969368001/

[26] *Id.*

[27] *Id.*

[28] *Id.*

63.    On November 20, 2019, Defendant extended these issues to the 2020 Jeep Wrangler and 2020 Jeep Gladiator pursuant to Service Bulletin No. 19-002-19 relating to "Shimmy In The Steering Wheel After Hitting An Irregularity On The Road Surface" and refers service technicians to an available video instructing them "on how to properly diagnosis [sic] and repair this issue." The Service Bulletin again acknowledges the defect, recognizing that "[t]he customer may notice a shimmy in the steering wheel after hitting an irregularity on the road surface such as an expansion joint, pothole or bump."

64.    FCA, through (1) its public acknowledgement of the problem; (2) its own records of customers' complaints, (3) dealership repair records, (4) records from the National Highway Traffic Safety Administration (NHTSA), (5) warranty and post-warranty claims, (6) internal pre-sale durability testing and internal investigations, and (7) other various sources, has always known or should have known the MY 2018-2019 and later defects in the Jeep Vehicles manifest as the "Death Wobble." Yet, at no time has FCA disclosed these defects or the "Death Wobble" to consumers, or warned of the "Death Wobble" despite knowing the defects persist today with no known way to remediate the existing Jeep Vehicles.

65.    Defendant failed to adequately research, design, test and/or manufacture the Jeep Vehicles before warranting, advertising, promoting, marketing, and/or selling them as suitable and safe for use in an intended and/or reasonably foreseeable manner.

66.    Defendant is experienced in the design and manufacture of consumer vehicles.  As an experienced manufacturer, Defendant conducts tests, including pre-sale durability testing, to verify the vehicles it sells are free from defect and align with Defendant's specifications and intended use of the Jeep, including routine highway travel.

67.    Upon information and belief, Defendant performs a four-part durability evaluation on its vehicles before they are released for sale to the general

public. The four steps are a virtual analysis, data acquisition, bench testing, and road testing.

68. The virtual analysis stage is conducted by FCA engineers. It is designed to identify risk areas early in the development process by using software simulations to identify potential part failures by using advanced mathematical models. This process allows FCA to identify and correct any issues with its vehicles before they are produced and when it is the least costly to remedy.

69. The data acquisition stage is also conducted by FCA engineers. FCA engineers collect and analyze road load data (data regarding the expected load the vehicles will undergo during their anticipated lifetime).

70. Bench testing involves testing individual components of the vehicle to simulate real world conditions. Bench testing is designed to verify the overall soundness of a design under controlled conditions. The testing performed typically includes testing various component parts to failure.

71. Finally, FCA's presale durability road testing system is nicknamed DUMBO, which stands for Durability Monitoring Box and Off-board.

72. The purpose of DUMBO is to detect preliminary degradation of vehicle component parts. Road testing of the vehicles is conducted and data is logged through an on-board unit within the vehicle, which is then transferred to a server for analysis. The DUMBO system is used to verify the correct execution of durability tests, to monitor any performance losses, and to collect data. The collected data is then run through various event recognition, event validation, and performance evaluation algorithms to identify any loss of performance.

73. FCA knew of the "Death Wobble" and its associated defects when performing these quality control metrics on the Jeep Vehicles and made no substantive design modifications to eliminate the defects in the Jeep Vehicles that manifest as the "Death Wobble."

### C. FCA Fails to Disclose or Warn About the "Death Wobble"

74. Despite its knowledge, FCA failed to warn consumers about the "Death Wobble" and how to safely gain control of the vehicle should it occur at highway speed.

75. Yet, in the 2018 Jeep Wrangler owner's manual, FCA does include a section titled "On-Road Driving Tips" and warns drivers about higher ground clearances and that the driver should "[a]void sharp turns and abrupt maneuvers" and that "failure to operate th[e] vehicle correctly may result in loss of control or vehicle rollover."[29]

76. FCA took it upon itself to speak and warn about safe operation of the Jeep. With its long standing knowledge of the Jeep's "Death Wobble," FCA had a similar duty to not only warn its consumers both before and after purchase, but provide similar precautions, warnings, and instructions on how to safely operate the vehicle during the "Death Wobble" and bring the vehicle back to normal operating conditions.

### D. FCA Touts Safety in Its Marketing and Advertising

77. FCA has touted its "commitment" and "dedication" to "transportation safety includ[ing] engineering active and passive features for diverse drivers and vehicle segments."[30] Amid worsening reliability ratings and recall investigations from NHTSA,[31] FCA's head of vehicle safety and regulatory compliance assured

---

[29]   2018 Jeep All New Wrangler Owners Manual at 359 (available at https://www.jlwranglerforums.com/downloads/guides/2018-Jeep-Wrangler-JL-JLU-Owners-Manual.pdf)

[30]   FCA 2015 Sustainability Report, https://www.fcagroup.com/en-US/investors/financial_information_reports/sustainability_reports/sustainability_reports/2015_Sustainability_Report.pdf

[31] Michael Wayland, *Quality Chief Leaves FCA Amid Recalls, Poor Reliability*, THE DETROIT NEWS (Oct. 29, 2014), http://www.detroitnews.com/story/business/autos/chrysler/2014/10/28/fiat-chrysler-replaces-longtime-quality-

the market in 2014 that "safety considerations are baked into every component of every product we make."[32]

78.    On its website, FCA represents that its "objective is to ensure vehicle quality and safety."[33]  Defendant informs consumers that FCA "vehicles meet the highest standard in terms of safety, ecological profile, driving performance and quality."[34]  Specifically, FCA's website focuses on Defendant's purported rigorous testing and quality control:

> To ensure that FCA vehicles deliver maximum safety and quality to customers over their entire life, every mechanical and electronic component, body part and trim element is rigorously tested. The designers work with a team of researchers during the testing phase to ensure vehicles meet the highest standards in terms of safety, ecological profile, driving performance and quality.[35]

79.    On its webpage advertising the 2018 Jeep Wrangler, FCA states that it "builds on a proven tradition of smart design combined with preventative features to help keep you safe and secure."[36]  It also says that the 2018 Jeep Wrangler "has been designed to make your life easier, more convenient, safer, and more secure."[37] FCA made these claims and advertisements touting its dedication to safety to boost sales of the Class Vehicles even though it knew the "Death Wobble" presented a safety risk on these vehicles.

chief/18052121/

[32] Sandy Smith, *Sandy Says: Are You a Safety Advocate?*, EHS TODAY, (Feb. 4, 2016), http://ehstoday.com/safety-leadership/sandy-says-are-you-safety-advocate

[33] https://www.fcagroup.com/en-US/media_center/insights/Pages/quality_lifecycle.aspx

[34] *Id.*

[35] *Id.*

[36] https://www.jeep.com/wrangler/safety-security.html

[37] *Id.*

### E.     <u>Warranties Related to the Defect</u>

80.     The Jeep Vehicles come with a three-year/36,000 mile Basic Limited Warranty. The Basic Limited Warranty lasts for three years from the date delivery of the Jeep Vehicle is taken, or for 36,000 miles on the odometer, whichever occurs first. The Jeep Vehicles also come with a five-year/60,000 mile Powertrain Warranty. The Powertrain Warranty covers the engine, transmission, and drive systems.

81.     FCA instructs vehicle owners and lessees to bring their vehicles to an FCA dealership for the warranty repairs. Many owners and lessees, like Plaintiff, have presented Jeep Vehicles to FCA dealerships with complaints about the "Death Wobble."

82.     Despite FCA's knowledge of the problem—and presumably how to appropriately remediate and prevent the "Death Wobble" from recurring (replacing suspension systems ball joints, track bar and upper inner tie rods)—FCA refuses to provide appropriate warranty coverage, instead opting only to replace the Jeep's steering damper pursuant to the warranty or suggests to the consumer that they have their tires aligned, rotated, or purchase new tires altogether, none of which is covered by the warranty nor will it solve the "Death Wobble" problem.

### <u>CLASS ALLEGATIONS</u>

83.     Plaintiff brings this action pursuant to the provisions of Rules 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure, on behalf of herself and the following proposed classes:

> **<u>Nationwide Class:</u>**
> All persons or entities in the United States who purchased or leased a Class Vehicle.
>
> **<u>California Subclass:</u>**
> All persons or entities who purchased or leased a Class Vehicle in California.

("Nationwide Class" and "California Subclass" collectively, "Classes" or "Class").

84. Excluded from the Class are FCA, its employees, officers, directors, legal representatives, heirs, successors, wholly- or partly-owned, and its subsidiaries and affiliates; FCA dealers; proposed Class counsel and their employees; the judicial officers and associated court staff assigned to this case and their immediate family members; all persons who make a timely election to be excluded from the Class; governmental entities; and the judge to whom this case is assigned and his/her immediate family.

85. Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of her claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim. Defendant has identified uniformity in approximately 192,000 Jeep Vehicles through the CSN V41 effort to remediate the "Death Wobble."

86. This action has been brought and may be properly maintained on behalf of the Class proposed herein under Federal Rule of Civil Procedure 23.

87. Numerosity. Federal Rule of Civil Procedure 23(a)(1): The members of the Class are so numerous and geographically dispersed that individual joinder of all Class members is impracticable. Defendant, at a minimum, has specifically identified about 192,000 2018-2019 Class Vehicles that are identified in Defendant's DealerCONNECT Global Recall System (GRS) and Vehicle Information Plus (VIP). Additional Class Vehicles may be identified during the pendency of this action and all owners and lessors notified by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, Internet postings, and/or published notice. The Class members may be easily derived from Jeep sales records.

88.   <u>Commonality and Predominance</u>. Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3): This action involves common questions of law and fact, which predominate over any questions affecting individual Class members, including, without limitation:

  a.  Whether FCA engaged in the conduct alleged herein;

  b.  Whether FCA designed, advertised, marketed, distributed, leased, sold, or otherwise placed the Jeep Vehicles into the stream of commerce in the United States;

  c.  Whether the "Death Wobble" constitutes a safety defect;

  d.  Whether FCA knew about the "Death Wobble" at the time of Plaintiff and the Class members purchased their Class Vehicles and failed to disclose the risk of the Death Wobble;

  e.  Whether FCA designed, manufactured, marketed, and distributed the Jeep Vehicles knowing that the "Death Wobble" could and would occur;

  f.  Whether FCA's conduct violates consumer protection statutes, false advertising laws, sales contracts, warranty laws, and other laws as asserted herein;

  g.  Whether FCA owed a duty to warn Plaintiff and Class members about the "Death Wobble" and how to safely stop it when operating their Jeep;

  h.  Whether Plaintiff and other Class members overpaid for their Class Vehicles;

  i.  Whether FCA breached the warranty by failing to properly inspect and repair the Jeep's suspension system after Plaintiff and Class members complained about the "Death Wobble";

  j.  Whether Plaintiff and other Class members are entitled to equitable relief, including, but not limited to, restitution or injunctive relief; and

  k.  Whether Plaintiff and the other Class members are entitled to damages and other monetary relief and, if so, in what amount.

89.   <u>Typicality</u>. Federal Rule of Civil Procedure 23(a)(3): Plaintiff's claims are typical of the other Class members' claims because, among other things, all Class members were comparably injured through FCA's wrongful conduct as described above.

90.   <u>Adequacy</u>. Federal Rule of Civil Procedure 23(a)(4): Plaintiff is an adequate Class representative because her interests do not conflict with the interests of the other members of the Class she seeks to represent; Plaintiff has retained counsel competent and experienced in complex class action litigation; and Plaintiff intends to prosecute this action vigorously.  The interests of the Class will be fairly and adequately protected by Plaintiff and her counsel.

91.   <u>Declaratory and Injunctive Relief</u>. Federal Rule of Civil Procedure 23(b)(2): FCA has acted or refused to act on grounds generally applicable to Plaintiff and the other members of the Class, thereby making appropriate final injunctive relief and declaratory relief with respect to the Class as a whole.

92.   <u>Superiority</u>. Federal Rule of Civil Procedure 23(b)(3): A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action.   The damages or other financial detriment suffered by Plaintiff and the other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against FCA, so it would be impracticable for the members of the Class to individually seek redress for FCA's wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system.  By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## <u>VIOLATIONS ALLEGED</u>

### <u>FIRST CAUSE OF ACTION</u>
**Violation of Magnuson-Moss Warranty Act**
**15 U.S.C. § 2301, *et seq*. ("MMWA")**
<u>**On Behalf of the Nationwide Class and California Subclass**</u>

93.    Plaintiff incorporates by reference and re-alleges the allegations contained in the preceding paragraphs of this Complaint, as though fully set forth herein.

94.    Plaintiff brings this cause of action on her own behalf and on behalf of the members of the Nationwide Class and California Subclass.

95.    The MMWA provides a private right of action by purchasers of consumer products against retailers who, *inter alia*, fail to comply with the terms of an implied or written warranty.  15 U.S.C. § 2310(d)(1).  As alleged herein, FCA has failed to comply with its implied warranty of merchantability with regard to the Jeep Vehicles.

96.    The Jeep Vehicles are consumer products, as that term is defined in 15 U.S.C. § 2301(1).

97.    Plaintiff and each member of the Nationwide Class and California Subclass are consumers, as that term is defined in 15 U.S.C. § 2301(3).

98.    FCA is a supplier and warrantor, as those terms are defined in 15 U.S.C. § 2301(4)-(5).

99.    The MMWA provides a cause of action for breach of warranty or other violations of the Act. 15 U.S.C. § 2310(d)(1).  FCA breached the implied warranty of merchantability for the Jeep Vehicles, as alleged herein, which it cannot disclaim under the MMWA, 15 U.S.C. § 2308(a)(1), by failing to provide merchantable goods.  Plaintiff has suffered damages as a result of FCA's breach of the implied warranty of merchantability as set forth herein. 15 U.S.C. § 2310(d)(1)-(2).

100.   FCA was provided notice of the claims raised by Plaintiff and was afforded a reasonable opportunity to cure.   FCA failed to cure in that it only replaced the vehicles steering damper with knowledge that the cause of the "Death Wobble" is due to loosening or weakening of the suspension system.   Until Plaintiff's representative capacity is determined, notice and opportunity to cure through Plaintiff, and on behalf of the Classes, can be provided under 15 U.S.C. § 2310(e).

101.   FCA's acts and omissions in violation of the MMWA are "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce," and they are unlawful. 15 U.S.C. § 2310(b); 15 U.S.C. § 45(a)(1).

102.   Plaintiff and the members of the Classes have suffered, and are entitled to recover, damages as a result of FCA's breach of express and/or implied warranties and violations of the MMWA.

103.   Plaintiff also seeks an award of costs and expenses, including attorneys' fees, under the MMWA to prevailing consumers in connection with the commencement and prosecution of this action. 15 U.S.C. § 2310(d)(2).   Plaintiff and the Classes intend to seek such an award, including expert witness costs and other recoverable costs, as prevailing consumers at the conclusion of this lawsuit.

### SECOND CAUSE OF ACTION
**Violation of California's Consumers Legal Remedies Act**
**CAL. CIV. CODE § 1750, *et seq.***
**On Behalf of the California Subclass**

104.   Plaintiff incorporates by reference and re-allege the allegations contained in the preceding paragraphs of this Complaint, as though fully set forth herein.

105.   Plaintiff brings this cause of action on her own behalf and on behalf of the members of the California Subclass.

106.   FCA is a "person" as defined by California Civil Code § 1761(c).

107.   Plaintiff and California Subclass members are "consumers" within the meaning of California Civil Code § 1761(d) because they purchased their Class Vehicles primarily for personal, family, or household use.

108.   By failing to disclose and concealing the "Death Wobble" defect from Plaintiff and California Subclass members, FCA violated California Civil Code § 1770(a), as it represented that the Class Vehicles had characteristics and benefits that they do not have and represented that the Class Vehicles were of a particular standard, quality, or grade when they were of another.   *See* Cal. Civ. Code §§ 1770(a)(5) & (7).

109.   Defendant's unfair and deceptive acts or practices occurred repeatedly in Defendant's trade or business, were capable of deceiving a substantial portion of the purchasing public and imposed a serious safety risk on the public.

110.   Defendant knew that the Class Vehicles suffered from an inherent safety defect, were defectively designed, and were not suitable for their intended use.

111.   Because of their reliance on Defendant's omissions, owners and/or lessees of the Class Vehicles, including Plaintiff and California Subclass members, suffered an ascertainable loss of money, property, and/or value of their Class Vehicles.   Additionally, because of the "Death Wobble" defect, Plaintiff and California Subclass members were harmed and suffered damages in that the Class Vehicles are not suitable for their intended use and are dangerous.

112.   Defendant was under a duty to Plaintiff and California Subclass members to disclose the defective and unsafe nature of the Class Vehicles because:

(a)   Defendant was in a superior position to know the true state of facts about the safety defect in the Class Vehicles;

(b)   Plaintiff and California Subclass members could not reasonably

have been expected to learn or discover that their vehicles had a defect with dangerous safety concerns until it manifested; and

(c) Defendant knew that Plaintiff and California Subclass members could not reasonably have been expected to learn of or discover the safety defect.

113. In failing to disclose the defective nature of the Class Vehicles, Defendant knowingly and intentionally concealed material facts and breached its duty not to do so.

114. The facts Defendant concealed from or failed to disclose to Plaintiff and California Subclass members are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase or lease the Class Vehicles or pay less. Had Plaintiff and California Subclass members known that the Class Vehicles were defective, they would not have purchased or leased the Class Vehicles or would have paid less for them.

115. Plaintiff and California Subclass members are reasonable consumers who do not expect their Class Vehicles to be defective, as described herein. This is the reasonable and objective consumer expectation relating to a Class Vehicle.

116. Because of Defendant's conduct, Plaintiff and California Subclass members were harmed and suffered actual damages in that, on information and belief, the Class Vehicles experienced and will continue to experience the "Death Wobble."

117. As a direct and proximate result of Defendant's unfair or deceptive acts or practices, Plaintiff and California Subclass members suffered and will continue to suffer actual damages.

118. Plaintiff and California Subclass members are entitled to equitable relief.

### THIRD CAUSE OF ACTION
**Breach of Express Warranty**
**CAL. COM. CODE §§ 2313 and 10210**
**On Behalf of the California Subclass**

119.   Plaintiff incorporates by reference and re-allege the allegations contained in the preceding paragraphs of this Complaint, as though fully set forth herein.

120.   Plaintiff brings this cause of action on her own behalf and on behalf of the members of the California Subclass.

121.   FCA is and was at all relevant times a "merchant" with respect to motor vehicles under Cal. Com. Code §§ 2104(1) and 10103(c), and a "seller" of motor vehicles under § 2103(1)(d).

122.   With respect to leases, FCA is and was at all relevant times a "lessor" of motor vehicles under Cal. Com. Code § 10103(a)(16).

123.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Cal. Com. Code §§ 2105(1) and 10103(a)(8).

124.   FCA provided all purchasers and lessees of the Class Vehicles with the same express warranties described herein, which became a material part of the bargain.

125.   In connection with the purchase or lease of a Jeep Vehicle, FCA provides an express Warranty for a period of three years or 36,000 miles, whichever occurs first.  This warranty exists to cover "defect in materials and workmanship."

126.   The parts affected by the "Death Wobble" were distributed by Defendant in the Class Vehicles and are covered by the warranties Defendant provided to all purchasers and lessors of Class Vehicles.

127.   Defendant breached these warranties by selling and leasing Class Vehicles with the "Death Wobble" defect, requiring repair or replacement within

the applicable warranty periods, and refusing to honor the warranties by providing free—and effective—repairs or replacements during the applicable warranty periods.

128.   Plaintiff notified Defendant within the warranty period, but Defendant already knew of the defects causing the "Death Wobble." Defendant failed to comply with its warranty obligations.

129.   In addition, FCA was provided notice of these issues by numerous complaints filed against it, including those submitted to NHTSA, within a reasonable amount of time after the defects were discovered.

130.   Defendant's Chief Technical Compliance Officer, Mark Chernoby, faulted the defects causing the "Death Wobble" as ones that resulted from "a combination of design and manufacturing process."

131.   As a direct and proximate cause of Defendant's breach, Plaintiff and California Subclass members bought or leased Class Vehicles they otherwise would not have, overpaid for their vehicles, did not receive the benefit of their bargain, and their Class Vehicles suffered a diminution in value.  Plaintiff and California Subclass members have also incurred and will continue to incur costs related to the diagnosis and repair of the "Death Wobble."

132.   Defendant's attempt to disclaim or limit these express warranties are unconscionable and unenforceable under the circumstances here.

133.   Specifically, Defendant's warranty limitation is unenforceable because it knowingly sold a defective product without informing consumers about the defect.

134.   The time limits contained in Defendant's warranty period were also unconscionable and inadequate to protect Plaintiff and California Subclass members.   The repeated band-aid repairs of replacing the steering damper are designed to push the "Death Wobble" issue beyond the warranty period shifting the repair burden to Plaintiff and California Subclass members.  A gross disparity

in bargaining power existed between Defendant and Class members, and Defendant knew or should have known that the Class Vehicles were defective at the time of sale and would fail well before their useful lives.

135.   Plaintiff and the California Subclass members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Defendant's conduct described herein.

**FOURTH CAUSE OF ACTION**
**Breach of the Implied Warranty**
**Pursuant to the Song-Beverly Consumer Warranty Act**
**CAL. CIV. CODE §§ 1792 and 1791.1, *et seq*.**
**On Behalf of the California Subclass**

136.   Plaintiff incorporates by reference and re-alleges the allegations contained in the preceding paragraphs of this Complaint, as though fully set forth herein.

137.   Plaintiff brings this cause of action on her own behalf and on behalf of the members of the California Subclass.

138.   Plaintiff and the California Subclass members are "buyers" within the meaning of Cal. Civ. Code § 1791(b).

139.   FCA is and was at all relevant times a "manufacturer" within the meaning of Cal. Civ. Code § 1791(j).

140.   The Class Vehicles are and were at all relevant times are "consumer goods" within the meaning of Cal. Civ. Code § 1791(a).

141.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under Cal. Civ. Code §§ 1791.1(a) & 1792.

142.   FCA knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased.   FCA directly sold and marketed the Class Vehicles to customers through authorized dealers, like those from whom

Plaintiff and the California Subclass members bought or leased their vehicles. FCA knew that the Class Vehicles would and did pass unchanged from the authorized dealers to Plaintiff and the California Subclass members, with no modification.

143. FCA provided Plaintiff and California Subclass members with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.

144. FCA impliedly warranted that the Class Vehicles were of merchantable quality and fit for such use. This implied warranty included, among other things: (i) a warranty that the Class Vehicles were manufactured, supplied, distributed, and/or sold by FCA were safe and reliable vehicles for providing transportation; and (ii) a warranty that the Class Vehicles would be fit for their intended use while the Class Vehicles were being operated.

145. Contrary to the applicable implied warranties, the Class Vehicles at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiff and California Subclass members with reliable, durable, and safe transportation. Instead, the Class Vehicles are defective, including, but not limited to, the "Death Wobble" defect, and the existence of the defect at the time of sale or lease and thereafter. FCA knew of this defect at the time these sale or lease transactions occurred.

146. As a result of FCA's breach of the applicable implied warranties, the Plaintiff and the California Subclass members suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the "Death Wobble" defect, Plaintiff and the California Subclass members were harmed and suffered actual damages.

//

//

**FIFTH CAUSE OF ACTION**
**Breach of the Implied Warranty of Merchantability**
**CAL. COM. Code § 2314**
**On Behalf of the California Subclass**

147.   Plaintiff incorporates by reference and re-alleges the allegations contained in the preceding paragraphs of this Complaint, as though fully set forth herein.

148.   Plaintiff brings this cause of action on her own behalf and on behalf of the members of the California Subclass.

149.   FCA is and was at all relevant times a merchant with respect to motor vehicles under Cal. Com. Code § 2104.

150.   A warranty that the Class Vehicles were in merchantable condition was implied by law in the instant transaction, pursuant to Cal. Com. Code § 2314.

151.   The Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used.  Specifically, the Class Vehicles are inherently defective in that they contain the "Death Wobble" defect, as described herein, and the Class Vehicles were not adequately designed, manufactured, and tested.

152.   FCA was clearly on notice of the defect, as described herein.

153.   Plaintiff and California Subclass members have had sufficient direct dealings with either FCA or its agents (*e.g.*, dealerships) to establish privity of contract.   Notwithstanding this, privity is not required because Plaintiff and California Subclass members are intended third-party beneficiaries of contracts between FCA and its dealers; specifically, they are the intended beneficiaries of FCA's implied warranties.   The dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and

intended to benefit the ultimate consumers only. Finally, privity is also not required because the Class Vehicles are dangerous instrumentalities due to the "Death Wobble" defect and nonconformities.

154. As a direct and proximate result of FCA's breach of the warranties of merchantability, Plaintiff and the California Subclass members have been damaged in an amount to be proven at trial.

**SIXTH CAUSE OF ACTION**
**Violation of California Business and Professions Code § 17200, *et seq*.**
**On Behalf of the California Subclass**

155. Plaintiff incorporates by reference and re-alleges the allegations contained in the preceding paragraphs of this Complaint, as though fully set forth herein.

156. Plaintiff brings this cause of action on her own behalf and on behalf of the members of the California Subclass.

157. Because of their reliance on Defendant's omissions, owners and/or lessees of the Class Vehicles, including Plaintiff and California Subclass members, suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, because of the "Death Wobble" defect, Plaintiff and California Subclass members were harmed and suffered actual damages.

158. California Business & Professions Code § 17200 prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice" and "unfair, deceptive, untrue or misleading advertising."

159. Plaintiff and California Subclass members are reasonable consumers who do not expect their Class Vehicles to be defective.

160. Defendant knew the Class Vehicles were defectively designed or manufactured, and were not suitable for their intended use.

161.   In failing to disclose the "Death Wobble" defect, Defendant has knowingly and intentionally concealed material facts and breached its duty not to do so.

162.   Defendant was under a duty to Plaintiff and California Subclass members to disclose the defective and unsafe nature of the Class Vehicles and because:

> (a)   Defendant was in a superior position to know the true state of facts about the safety defect in the Class Vehicles; and
>
> (b)   Defendant actively concealed the defective nature of the Class Vehicles from Plaintiff and California Subclass members.

163.   The facts Defendant concealed from or failed to disclose to Plaintiff and California Subclass members are material in that a reasonable person would have considered them to be important in deciding whether to purchase or lease Class Vehicles.  Had they known of the defect, Plaintiff and California Subclass members would have paid less for Class Vehicles or would not have purchased or leased them at all.

164.   Defendant continued to conceal the defective nature of the Class Vehicles even after problems were reported.

165.   Defendant's conduct was and is likely to deceive consumers.

166.   Defendant's acts, conduct, and practices were unlawful, in that they constituted:

> (a)   Violations of California's Consumers Legal Remedies Act;
>
> (b)   Violations of the Song-Beverly Consumer Warranty Act;
>
> (c)   Breach of the Implied Warranty of Merchantability under California Commercial Code section 2314;
>
> (d)   Violations of the Magnuson-Moss Warranty Act; and
>
> (e)   Breach of Express Warranty under California Commercial

Code section 2313.

167.   By its conduct, Defendant has engaged in unfair competition and unlawful, unfair, and fraudulent business practices.

168.   Defendant's unfair or deceptive acts or practices occurred repeatedly in Defendant's trade or business and were capable of deceiving a substantial portion of the purchasing public.

169.   As a direct and proximate result of Defendant's unfair and deceptive practices, Plaintiff and California Subclass members have suffered and will continue to suffer actual damages.

170.   Defendant has been unjustly enriched and should be required to make restitution to Plaintiff and California Subclass members.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of members of the Classes, respectfully requests that the Court enter judgment against FCA and in favor of Plaintiff, the Classes, and award the following relief:

A.     Certification of this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, declaring Plaintiff as the representative of the Classes, and Plaintiff's counsel as counsel for the Classes;

B.     An order awarding declaratory relief and temporarily and permanently enjoining FCA from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint;

C.     Appropriate injunctive and/or declaratory relief, including, without limitation, an order that requires Defendant to repair, recall, and/or replace the Jeep Vehicles and to extend the applicable warranties to a reasonable period of time, or, at a minimum, to provide Plaintiff and Class members with appropriate curative notice regarding the existence and cause of the "Death Wobble";

D.      An award of appropriate damages to repair or replace the Jeep vehicles;

E.      A declaration that FCA is financially responsible for all Class notice and the administration of Class relief;

F.      An order awarding any applicable statutory and civil penalties;

G.      An order requiring FCA to pay both pre- and post-judgment interest on any amounts awarded;

H.      An award of costs, expenses, and attorneys' fees as permitted by law; and

I.      Such other or further relief as the Court may deem appropriate, just, and equitable.

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands trial by jury on all causes of action.


Dated: March 6, 2020                    Respectfully submitted,

                                        **MOON LAW APC**

                                        By: /s/Christopher D. Moon
                                            CHRISTOPHER D. MOON
                                            KEVIN O. MOON
                                            Attorneys for Plaintiff

# EXHIBIT A

DocuSign Envelope ID: 22CA716D-590E-48C6-A099-C248E85A7BB1

Christopher D. Moon (State Bar No. 246622)
*chris@moonlawapc.com*
Kevin O. Moon (State Bar No. 246792)
*kevin@moonlawapc.com*
**MOON LAW APC**
600 West Broadway, Suite 700
San Diego, California 92101
Telephone: (619) 915-9432
Facsimile: (650) 542-8432

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MELINDA MARTINEZ, Individually, on behalf of herself and others similarly situated,<br><br>        Plaintiff,<br><br>    v.<br><br>FCA US, LLC,<br><br>        Defendant. | Case No.:<br><br>**DECLARATION OF PLAINTIFF MELINDA MARTINEZ REGARDING VENUE PURSUANT TO CALIFORNIA CIVIL CODE § 1780(d)** |

I, Melinda Martinez, hereby declare:

1. I am the named-plaintiff and a prospective class member in the above-entitled action.

2. I am an adult, over 18 years old. I have personal knowledge of the facts stated herein and could competently testify thereto if called upon to do so.

3. I am currently a resident of Rancho Cucamonga, California.

4. California Civil Code § 1780(d) provides that a plaintiff seeking to bring a claim under section 1780(a) of the California Consumer Legal Remedies Act may commence that action "in the county in which the person against whom it is brought resides, has his or her principal place of business, or is doing business, or in the county where the transaction or any substantial portion thereof occurred."

5. I purchased a Class Vehicle at issue in Ontario, California.

6. Accordingly, the Complaint filed in the above-entitled action, is filed in the proper venue pursuant to California Civil Code § 1780(d).

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on March 5, 2020, in Rancho Cucamonga, California.



MELINDA MARTINEZ

VENUE DECLARATION OF PLAINTIFF MELINDA MARTINEZ